**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| TIM ROBERTSON, | : | Case No. 1:23-cv-164 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| WINDOW NATION, LLC, | : | |
| | : | |
| Defendant. | : | |

**ORDER GRANTING DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT AND**
**DISMISSING THE CASE**

This civil action is before the Court on Defendant's Motion for Summary Judgment (Doc. 13) and the parties' responsive memoranda (Docs. 18, 20).[1]

## I. BACKGROUND

Plaintiff Tim Robertson ("Plaintiff") brings this civil action against his former employer, Defendant Window Nation, LLC ("Defendant"), alleging claims of disability discrimination and failure to accommodate, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq*. and Ohio Rev. Code § 4112, as well as age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 629, *et seq*. and Ohio Rev. Code § 4112.

---

[1] Plaintiff separately filed Declarations in support of his response in opposition. (Docs. 14, 15, 16, and 17).

## A. Undisputed Material Facts[2]

### *1. Plaintiff's Employment History with Defendant*

Defendant Window Nation is a corporation, doing business in Ohio, offering window, door, and siding replacement services. (Doc. 1 at ¶ 2; Doc. 13 at 7, ¶ 1). Initially, Defendant operated two branches in Ohio—one in Cleveland and one in Columbus. (Doc. 13 at 8, ¶ 2). However, in early 2021, Defendant sought to expand its foothold in the Ohio market by opening two new branches in Dayton and Cincinnati. (*Id.* at ¶ 3).

On February 2, 2021, Defendant hired Plaintiff Tim Robertson to serve as the Branch Manager of Defendant's Cincinnati location. (*Id.* at ¶ 5). Indeed, Plaintiff was the first Brand Manager hired for the new location. (*Id.* at ¶ 6). At the time of his hiring, Plaintiff was 60 year old. (Doc. 1 at ¶ 13; Doc. 18 at 5). Plaintiff also helped manage the Dayton Branch's warehouse for a period of time. (Doc. 13 at 8, ¶ 7). As the Branch Manager, Plaintiff was typically required to work 40-50 hours per week. (*Id.* at ¶ 9).

The Branch Manager position required the performance of many duties and responsibilities important to maintaining a functional and profitable branch, included, *inter alia*: managing and supervising employees; handling customer relations and issues; managing and overseeing Cincinnati's on-site warehouse, including the management of

---

[2] Specific citations to the record for these findings of undisputed facts are found in Defendant's Proposed Undisputed Facts (Doc. 13 at 7-23) and Plaintiff's response to Defendant's proposed facts (Doc. 18-1), accompanied, where appropriate, with the Court's direct citations to the depositions, declarations, and exhibits (Docs. 13-1 – 13-6; Docs. 14 – 17). The Court's citations to the record refer to the Doc. and page number as shown in the ECF header.

inventory available to complete assigned installations; hiring, scheduling, and managing third-party contractors and crew to complete customer installations; ensuring proper installation of Defendant's products; and managing profits and losses of the assigned branch. (*Id*. at 8-10, ¶¶ 8-23; Doc. 13-2 at 59, 250). Notably, because Cincinnati was a new branch, its revenue goals were set lower than the goals for Cleveland or Columbus, in order to reflect an initial ramp-up period. (Doc. 13 at 9, ¶ 13).[3]

Upon commencing his employment in February 2021, Plaintiff attended a one-week training seminar at Defendant's Cleveland branch, which training seminar largely consisted of Plaintiff shadowing Cleveland's Branch Manager, Joe Tripi ("Mr. Tripi"). (*Id*. at ¶ 26).[4] Specifically, Plaintiff was able to observe Mr. Tripi on the job, ask him questions regarding specific processes and procedures, accompany him during a home installation, and otherwise interact with the Cleveland branch staff. (Doc. 13-2 at 73-74).

---

[3] Plaintiff disputes that, as the Branch Manager, he was responsible for ensuring that the Cincinnati branch's revenue goals were met. (Doc. 18 at 2, ¶ 14). Plaintiff cites to his deposition, in which he stated that "sales didn't have anything to do with [his] job." (*Id*.; Doc. 13-2 at 162:22-25). Notably, however, the job description for the Branch Manager position—which Plaintiff verified as correct during his deposition—included responsibilities such as: "Recommend, implement, and monitor actions to increase revenue generation and profitability; <u>**Deliver on branch margin and profitability targets**</u>; Manage branch expenditures within budget guidelines." (Doc. 13-2 at 250) (emphasis added); (*Id*. at 59:11-19). Additionally, during his deposition, Plaintiff explained that certain aspects of the branch's operations were not within his control but, nevertheless, he expressly acknowledged: "My responsibility is to try to meet the [budgeting/revenue] goals." (*Id*. at 170:2-3). In short, while Plaintiff did not bear sole responsibility for every facet of the business, the evidence shows that increasing profitability and meeting revenue goals did ultimately fall within Plaintiff's purview as the Branch Manager.

[4] From 2012 to 2017, Joe Tripi served as Defendant's Director of Operations. (Doc. 13-1 at 7-8). After leaving Defendant's employ in 2017, Mr. Tripi later returned to work for Defendant again in August 2019 as the Cleveland branch's Project/Branch Manager, and ultimately became the Director of Shared Services in February 2023. (*Id.*)

In his deposition, Mr. Tripi recalled his observations of Plaintiff during the one-week training seminar, explaining that Plaintiff had "window knowledge" but appeared to have difficulties with the managerial aspects of his new position. (Doc. 13-1 at 95-99). Mr. Tripi recalled conveying his concerns to supervisory staff, but noted that his intention was to suggest Plaintiff "be monitored to ensure that he was meeting the expectations." (*Id*. at 95-96).[5] Specifically, Mr. Tripi stated he was "concerned with [Plaintiff's] ability to stay organized," and noted that Plaintiff "seemed to struggle maneuvering the system, and [] seemed to struggle conceptualizing what the responsibilities were going to be." (*Id*. at 95, 96-97). For example, Mr. Tripi recalled Plaintiff "struggling to catch on" with certain processes and asking Mr. Tripi to demonstrate or explain specific tasks over again, during and after the training. (*Id*. at 98).

Indeed, during his deposition, Plaintiff recalled that he "felt bad," believing that he was "wasting [Mr. Tripi's] time sometimes, … asking a lot of questions and being his shadow." (Doc. 13-2 at 73). Nevertheless, Plaintiff stated that his training week was "[h]elpful for the real world" and provided him "a good picture of what life was probably going to be," although he noted that his circumstances were ultimately different because, unlike Cleveland, the Cincinnati branch was not yet fully staffed. (*Id*. at 73, 74).

---

[5] Mr. Tripi believed he likely would have conveyed his concerns to the Regional Director, but he could not recall specifically. (Doc. 13-1 at 95). Nevertheless, Terri Smyth-Riding ("Ms. Smyth-Riding"), who served as Defendant's Director of Human Resources at the time and is currently the VP-People Operations, corroborated Mr. Tripi's recollection and stated in her Declaration that: "Joe Tripi, the Branch Manager in Cleveland, informed me that he had serious concerns with [Plaintiff's] ability to perform as a Branch Manager, following [Mr.] Tripi's initial training of [Plaintiff] in February, 2021." (Doc. 13-6 at ¶ 8).

Specifically, as the first Branch Manager, Plaintiff was tasked with opening the Cincinnati Branch in February 2021, at which time the branch staff consisted of a Branch Manager (Plaintiff), a Measure Technician, a Warehouse Technician, and a Production Manager (Paul "PJ" McDonald, hereinafter, "Mr. McDonald"). (*Id*. at 75, 78; Doc. 13 at 11, ¶¶ 33-35).[6] Thus, Plaintiff stated during his deposition that his branch was in need of a service technician, an installation manager, and an office coordinator; however, Plaintiff was told that these positions would not be filled until the branch achieved certain revenue goals. (Doc. 13-2 at 75, 76). Specifically, Plaintiff testified that he was advised (albeit, informally) that additional staff could be hired once the branch was meeting a revenue goal of roughly $1,000,000 per month. (*Id*. at 136-37). And although Plaintiff never reached this goal during his tenure as Branch Manager, a service technician was ultimately hired for Cincinnati, which Plaintiff said, "helped tremendously." (*Id*. at 82; Doc. 13 at 12, ¶ 43).

Plaintiff described the first few months of his employment as generally positive, stating: "I was doing well for a new branch opening from the ground up." (*Id*. at 84). However, Plaintiff noted that he was not given "very much direction, if any" and that "there wasn't a book or a guideline for opening a branch." (*Id*.) Nevertheless, Plaintiff was able to seek guidance from other branches for operational and procedural questions. (*Id*. at 85, 88). Additionally, Plaintiff had weekly meetings with a "branch opening

[6] The Cincinnati branch also had a sales department; however, the sales team operated separately and did not report to Plaintiff. (Doc. 13-2 at 78-79).

team," which team Plaintiff stated was largely focused on the branch's administrative set-up rather than daily operations. (*Id*. at 84).

### *2. Plaintiff's Performance as Branch Manager*

Because the Cincinnati Branch was newly opened in February 2021, Defendant initially set very low revenue goals, thereby ensuring that the goals would be realistic to achieve. (Doc. 13 at 12, ¶¶ 38-39). Indeed, during the first quarter of 2021 ("Q1"), Plaintiff was not expected to make any installations and, thus, was given no revenue goal at all. (*Id*. at ¶ 40; Doc. 13-2 at 302, Ex. 6). Nevertheless, in March 2021, the Cincinnati Branch did make installations, and Plaintiff stated during his deposition that he received praise from the Regional Director at the time, Mike Hoitt ("Mr. Hoitt"), "because they weren't expecting us to have any revenue." (*Id*. at 80).

Although no goals were set for the Cincinnati Branch in Q1, Plaintiff was expected to meet monthly and quarterly revenue goals starting in April 2021.[7] (*Id*. at 302-304, Ex. 6). Specifically, Cincinnati was given a goal of $136,798 for April 2021, $332,976 for May 2021, and $357,290 for June 2021, thereby totaling a total quarterly revenue goal of $827,064 for the second quarter of 2021 ("Q2"). (*Id*. at 302).[8] As time went on, the total quarterly revenue targets for the Cincinnati Branch increased

[7] Revenue goals were set according to a number of a considerations, including how many sales were recently made, the time to receive the product, and a reasonable estimation of how long it would take to schedule and complete the installation (in 2021, typically, 60 to 150 days from the sale). (Doc. 13-3 at 36-37). Notably, in Cincinnati, Defendant was purchasing its products from a local manufacturer known to have a quicker turnaround time. (*Id*. at 40). Additionally, as a newer market, Cincinnati did not have to contend with a backlog of jobs to schedule. (*Id*.)

[8] For reference, in Q2, the Cleveland and Columbus Branches were given total quarterly goals of $4,115,105 and $5,453,306, respectively.

incrementally, with Defendant setting $1,443,035 total for the third quarter of 2021 ("Q3"), and $1,815,474 total for the fourth quarter of 2021 ("Q4"). (*Id*. at 303-304). Plaintiff was aware of his revenue targets at all times during his employment, and had the ability to track his branch's revenue daily. (Doc. 13 at 13, ¶ 46). Moreover, Plaintiff regularly discussed his revenue goals and performance with his Regional Manager. (*Id*. at ¶ 49).

In March, April, and May 2021, Plaintiff met and exceeded Cincinnati's monthly revenue goals. (Doc. 13-2 at 302).[9] However, after May 2021, Plaintiff did not meet the monthly or quarterly revenue goals at any point, for the remainder of his tenure as Branch Manager. (*Id*. at 303-304). Plaintiff acknowledged during his deposition that failing to meet revenue goals was considered "a negative for the company and [his] branch." (*Id*. at 112). Plaintiff further explained that the Regional Director, Mr. Hoitt, would check in with him when revenue goals were not met, in order to discuss what jobs were "in the pipeline" and how to "make up for that [missed] goal." (*Id*. at 105).

By October 2021, Defendant assigned Mr. Tripi, who was the Cleveland Branch Manager, to serve as the Senior Branch Manager Mentor for the Cincinnati Branch. (Doc. 13-1 at 41-43, 134-137; Doc. 13-2 at 102, 156).[10] This assignment required Mr. Tripi to review and oversee the performance of the branch for a period of time. (Doc. 13

[9] Although the revenue goal for June 2021 was not met, Plaintiff did exceed Cincinnati's total quarterly goal for Q2 due to the excess from April and May 2021. (Doc. 13-2 at 302, Ex. 6).

[10] Additionally, Mr. Tripi was assigned as the mentor for the Columbus and Dayton Branches, as both branches were also underperforming. (Doc. 13-1 at 134-137, 139-141).

at 13, ¶ 52). Indeed, as an experienced employee, Mr. Tripi was often asked to review the performance of struggling branches. (*Id*. at ¶ 50).

As part of his mentoring role, Mr. Tripi visited the Cincinnati Branch in early to mid-October 2021 and met with Plaintiff, as well as other branch employees. (Doc. 13-1 at 46; Doc. 13-2 at 156). Prior to arriving in Cincinnati, Mr. Tripi reviewed reports to assess the branch's performance and efficiency metrics such as revenue, accounts receivables, the number of pending installations that remained unscheduled, and whether completed jobs were properly tracked in the system. (Doc. 13-1 at 56-58). Mr. Tripi stated during his deposition that, based on his review of the report, "Cincinnati was under-performing." (*Id*. at 55). Mr. Tripi also reviewed logs of customers' complaints and escalations made to the Better Business Bureau and to Defendant's corporate offices. (*Id*. at 56, 58).

Additionally, Mr. Tripi testified that he was asked to visit the Cincinnati Branch, in part, to assess concerns over Plaintiff's availability and performance as the Branch Manager. (*Id*. at 55-56). Specifically, in late-July 2021, the Cincinnati Branch's Production Manager, Mr. McDonald, resigned his employment without notice. (*See*, *e.g.*, Doc. 16-6 at 2-3). At the time, it was the understanding of supervisory staff that Mr. McDonald's departure was the result of a poor working relationship with Plaintiff—that is, Mr. McDonald felt he was often called upon to shoulder Plaintiff's responsibilities due to Plaintiff frequently being out in the field, rather that performing his duties in the office. (Doc. 13-1 at 55; Doc. 13-3 at 19; Doc. 13-4 at 40; Doc. 13-5 at 24-25). Notably, in his Declaration, Mr. McDonald stated that he "enjoyed working with [Plaintiff]," and that the

reason he "resigned [his] position … [was] because of the lack of support from regional and corporate management for the Cincinnati branch." (Doc. 14 at 3, ¶ 16, 18). However, Mr. Hoitt testified during his deposition that, prior to Mr. McDonald's departure, Mr. McDonald had expressed frustration with Plaintiff's management of the office. (Doc. 13-5 at 24; *see* Doc. 13-4 at 40-41). Moreover, Defendant's Director of Human Resources, Ms. Smyth-Riding, recalled that Mr. McDonald applied for another position with Defendant after Plaintiff's termination and that, during the interview process, Mr. McDonald stated his prior, abrupt departure was the result of Plaintiff's management. (*Id*. at 39, 41).

In any event, based on Mr. McDonald's departure, Mr. Tripi explained that part of his task while visiting the Cincinnati Branch as the mentor was to assess the situation and "see how things were going" with Mr. McDonald's replacement, Gwen Mullins ("Ms. Mullins"). (Doc. 13-1 at 55-56). Additionally, prior to arriving in Cincinnati, Mr. Tripi was advised that two of Defendant's top performing installers had also expressed dissatisfaction and were threatening to leave. (*Id*. at 59, 61-62). Mr. Tripi testified that he reached out directly to the installers and their crews, "and both of them [] cited [Plaintiff] as the primary issue for their reason for considering leaving." (*Id*. at 62). Specifically, the installers advised Mr. Tripi that Plaintiff was difficult to get ahold of, was not responsive to issues the installers were raising in the field, and was failing to clearly communicate with them regarding scheduling. (*Id*. at 63).

Mr. Tripi first visited Cincinnati in his new mentorship capacity on October 14, 2021. (*Id*. at 72). During his visit, Mr. Tripi spoke with Ms. Mullins, who was hired as

the new Production Manager in or before August 2021, roughly one month after Mr. McDonald's abrupt departure.[11] (*Id*. at 73). Ms. Mullins advised Mr. Tripi that Plaintiff would occasionally leave the office and that Ms. Mullins would be unable to reach him. (*Id*.) Mr. Tripi also spoke with Cincinnati's Sales Manager, Joey Jones ("Mr. Jones"), who indicated that he "would have to step in frequently dealing with customer interaction because [Plaintiff] either wasn't handling it or was not handling it well." (*Id*. at 74).[12]

After speaking with employees, as well as assessing and observing the Cincinnati Branch operations, Mr. Tripi communicated his recommendation that Plaintiff be terminated from his position. (*Id*. at 90). Mr. Tripi opined that Plaintiff "was not going to have the skill set necessary to do the job to the performance levels [Defendant] needed and ultimately [Plaintiff] would need to be replaced." (*Id*.) Moreover, managers aside from Mr. Tripi—such as Sales Director, Ray Price ("Mr. Price")—were also calling for Plaintiff's termination. (Doc. 13-6 at ¶ 11; Doc. 13-2 at 325-329). Specifically, on October 22 and October 28, 2021, Mr. Price contacted Defendant's Chief Executive Officer, Harley Magden ("Mr. Magden) to recommend that Plaintiff be replaced as the Branch Manager, citing reports of repeated mistakes in the field, failures to address customers' issues, poor management, and the potential loss of installers. (*Id*.)

---

[11] Although the precise date of Ms. Mullins' hire is unclear, a text exchange between Ms. Mullins and Plaintiff evidences that Ms. Mullins was employed with Defendant by August 24, 2021. (Doc. 13-2 at 305-306).

[12] On September 23, 2021 and again on October 22, 2021, Mr. Jones emailed supervisory staff to advise of this precise concern, including a list of customer complaints and problems arising from Plaintiff's apparent failure to timely address and resolve issues. (Doc. 13-2 at 327-329).

Ultimately, the decision was made to terminate Plaintiff's employment, which decision was approved by Director of Human Resources, Ms. Smyth-Riding. (Doc. 13 at 18, ¶ 87). On October 29, 2021, Mr. Tripi phoned Plaintiff to advise him of his termination, citing performance-based issues. (*Id*. at ¶ 88; Doc. 13-1 at 68-69; Doc. 13-4 at 57-63).

### *3. Plaintiff's Medical History*

Plaintiff was diagnosed with Stage 1 prostate cancer in August 2021, *i.e.*, six months after he was hired by Defendant. (Doc. 13 at 20, ¶ 101; Doc. 13-2 at 21-22). Plaintiff testified that from the time of his cancer diagnosis (August 2021), until he underwent surgery in October 2021, he had no issues relating to his cancer diagnosis, did not undergo any form of treatment, and did not have any restrictions. (Doc. 13 at ¶ 102; Doc. 13-2 at 23, 97-98).

On Friday, October 15, 2021, Plaintiff had outpatient surgery, for which he requested, and was granted, the day off from work. (*Id*. at 24; Doc. 13 at 20, ¶ 103).[13] Initially, Plaintiff intended to return to work on the following Monday, October 18, 2021, but was unable to do so, due to complications from his surgery. (*Id*. at ¶ 104; 13-2 at 126; Doc. 13-4 at 155).

Rather, on Sunday, October 17, 2021, Plaintiff emailed Mr. Tripi and Mr. Hoitt to inform them that he was not feeling well enough to return but would be working from

[13] Defendant's Proposed Undisputed Facts categorize the surgery as "in-patient"; however, Plaintiff testified during the deposition that the procedure was outpatient and that he returned home the same day.

home, and suggested that he might come in on Tuesday, October 19, 2021. (*Id.*) Mr. Hoitt responded promptly with: "Sorry for the news Tim. I would sit tight and make sure you are good to go when you are ready." (*Id.*)

On October 18, 2021, Human Resources ("HR") emailed Plaintiff and instructed him to obtain "a doctor's note releasing [Plaintiff] to return to work." (*Id*. at 154). As requested, on October 20, 2021, Plaintiff emailed HR a note from his physician, stating that he could return to work with a catheter on October 21, 2021, but was restricted to light lifting for six weeks. (*Id*. at 21, ¶ 107; Doc. 13-2 at 339). In accordance with the letter, Defendant permitted Plaintiff to remain off from work until he was able to return with the noted restrictions on October 21, 2021. (Doc. 13 at 20, ¶ 106). Additionally, Plaintiff opined during his deposition that Defendant likely would have accommodated additional time off for his recovery had he requested it. (Doc. 13-2 at 133).

Although Plaintiff initially returned to work as scheduled, Plaintiff testified that he began experiencing pain on or around Monday, October 25, 2021. (*Id*. at 126). Accordingly, he returned to the hospital on Wednesday, October 27, 2021 and was released on Friday, October 29, 2021. (*Id.*; Doc. 16-5 at 3). Plaintiff concedes that Defendant accommodated this time off as well. (Doc. 13 at 21, ¶ 109). At the time of his release from the hospital, Plaintiff's physician advised that he could return to work part-time with light duties for the next seven days. (*Id*. at ¶ 110). That same day, October 29, 2021, Plaintiff returned to work, but was ultimately called and terminated later that afternoon. (Doc. 13-4 at 61).

Notably, both Mr. Tripi and Ms. Smyth-Riding, who were primarily involved in Plaintiff's termination, testified that they were unaware of Plaintiff's cancer diagnosis. (Doc. 13-1 at 29-30, 54-55; Doc. 13-4 at 51-55; Doc. 13-6 at ¶ 15). Moreover, concerns regarding Plaintiff's performance were raised and discussed among Defendant's employees and supervisory staff prior to Plaintiff's October 2021 surgery. (*See, e.g., id.* at ¶ 8; Doc. 13-2 at 327-329; Doc. 13-5 at 24-25). Indeed, in her Declaration, Ms. Smyth-Riding stated that: "The decision to discharge [Plaintiff] was made purely due to his poor performance and his inability to properly manage the Cincinnati branch. Any Branch Manager with similar performance issues would have been discharged regardless of their age, alleged disability, or request for accommodation." (Doc. 13-6 at ¶ 13). Ms. Smyth-Riding further noted that: "the individual who took over [Plaintiff's] duties in the interim following his discharge was over the age of 40 … [and] the individual ultimately hired to replace [Plaintiff] as the Branch Manager in Cincinnati is over the age of 40." (*Id*. at ¶ 14).

Finally, Ms. Smyth-Riding noted in her Declaration that Defendant is aware of another Branch Manager who is currently diagnosed with cancer. (Doc. 13 at 19, ¶ 95). In response, Defendant approved an extended leave of absence for this Branch Manager to receive medical treatment, and the Branch Manager remains employed with Defendant. (*Id*. at ¶¶ 96, 97). Indeed, Plaintiff acknowledged during his deposition that he was aware another Branch Manager had cancer, "told everybody" about his diagnosis, and still was not terminated from employment. (*Id*. at ¶ 98). Additionally, Mr. Tripi testified during his deposition that he himself has had medical issues (albeit, not cancer)

that required similar accommodations to Plaintiff's—*i.e.*, lifting and driving restrictions. (Doc. 13-1 at 115). Ms. Smyth-Riding confirmed that Defendant accommodated Mr. Tripi's medical restrictions. (Doc. 13-6 at ¶ 16). Further, Mr. Tripi testified that such physical restrictions posed no considerable hinderance to carrying out the essential functions of Branch Manager, noting that: "Most of the physical functions [of a Branch Manager] have to be done via looking at your computer, … staying within your routine and being organized." (Doc. 13-1 at 115).

***4. Plaintiff's Post-Termination Status***

Plaintiff testified that he had a follow-up visit with his physician approximately one week after his October 29, 2021 termination, but did not seek clarification as to whether he had any continuing work restrictions, given the fact that he was no longer employed. (Doc. 13-2 at 10-12). Thus, Plaintiff testified that he does not know when, if ever, he might have been able to return to work full-time, without restrictions, following his October 2021 surgery. (*Id*. at 14, 15-16). Plaintiff further explained that he began applying for new jobs after his termination, but he did not first seek clarification from his physician as to whether he may be restricted from performing any of the tasks required for those positions. (*Id*. at 17-20, 43).

Plaintiff testified that, within a month of seeking new employment, he had one job interview with a potential new employer, Alside, which Plaintiff believed would lead to a job offer. (Doc. 13 at 22, ¶ 116; Doc. 13-2 at 43). However, Plaintiff was also set to begin radiation treatment, which treatment would occur every day for seven weeks. (*Id*. at 44). Accordingly, Plaintiff elected to withdraw his application from Alside because he

"didn't want to enter into an agreement with a new employer who's counting on [him] and not be[] able to potentially perform to the level that [he] needed or would have needed to." (*Id.*)

In addition to Plaintiff's own health, Plaintiff's wife was diagnosed with a serious health issue beginning in June 2021. (Doc. 13 at 22, ¶ 118). Plaintiff testified that his wife was bedridden and needed full-time, 24/7 care. (*Id*. at ¶ 119). From July 2021 through December 2021, Plaintiff's family assisted in helping provide care to his wife. (*Id*. at ¶ 120). However, during this time, and while still employed with Defendant, Plaintiff did make and/or receive personal calls to and from his wife and her caregivers throughout the workday. (Doc. 13-2 at 98). Additionally, Plaintiff testified that he could not recall whether he went home to check on or care for his wife during workhours, though he acknowledged that it was "possible." (*Id*. at 98-99).

Following Plaintiff's termination, he began caring for his wife regularly throughout the day, explaining that: "I had to cook, clean, bathe her. So it's a 24/7 job. When she's not sleeping, … or sleeping and woke up, I had to be there." (*Id*. at 36). Initially, in November and December 2021, Plaintiff still had some assistance from family and friends to care for his wife. (*Id*. at 35-38). However, due to family circumstances, by January 2022, Plaintiff no longer had assistance, nor could he afford to hire a full-time caregiver. (*Id*. at 34-39). Plaintiff testified that, although he was sincerely applying for jobs during this time, he also had to be at home for extended periods of time and, therefore, needed to find a position that was "the right fit for [his]

situation [and his] family's situation. … Like, limited[.] … [E]xtremely long hours or something, [] would have been probably a problem." (*Id*. at 50).

Ultimately, Plaintiff stopped looking for new employment in September 2022, and then retired with Social Security in October 2022. (Doc. 13 at 23, ¶ 124).

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

## III. ANALYSIS

Plaintiff alleges claims of disability discrimination and failure to accommodate, in violation of the ADA, 42 U.S.C. § 12101, *et. seq*. and Ohio Rev. Code § 4112, as well as age discrimination in violation of the ADEA, 29 U.S.C. § 629, *et seq*. and Ohio Rev. Code § 4112. (Doc. 1).

Defendant moves for summary judgment, arguing that Plaintiff cannot show that either his age or disability are the "but for" causes for his discharge. (Doc. 13 at 1, 6-7, 24-27, 29-30). Further, Defendant argues that Plaintiff's failure to accommodate claim fails because Plaintiff concedes he was granted time off from work for a medical procedure and was permitted to return to work with restrictions. (*Id*. at 2, 7, 27-29). And, in the event the Court does not grant summary judgment in Defendant's favor, Defendant argues that Plaintiff is not entitled to lost wages after November 2021, or January 2022 or September 2022 at the very latest. (*Id*. at 2, 7, 30-31).

As set forth, *infra*, the Court finds, upon the undisputed material facts, that: (1) Plaintiff fails to make a *prima facie* case for his claims of disability discrimination, age discrimination, and failure to accommodate; (2) even if Plaintiff had met his initial burden, Defendant had a legitimate, non-discriminatory reason for its decision to terminate his employment; and (3) Plaintiff fails to show that Defendant's articulated reason is a mere pretext. Accordingly, summary judgment in favor of Defendant is appropriate.

### A. Plaintiff's Discrimination Claims[14]

"A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Kline v. Tennessee Valley Auth*., 128 F.3d 337, 348 (6th Cir.1997)).

When a plaintiff relies on circumstantial evidence of discrimination, as Plaintiff does in the instant case, the Court applies the *McDonnell Douglas* burden-shifting framework to evaluate the allegations.[15] *Moore v. Next Generation Hosp. LLC*, No. 24-4050, 2025 WL 3025607, at *4 (6th Cir. Oct. 29, 2025) (citing *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021)); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981); *Laster*, 746 F.3d at 730. If the plaintiff successfully makes

[14] Because Plaintiff's § 4112 claims are subject to the same standard as the ADA and ADEA claims, the Court need not consider the state law claims separately. *E.g.*, *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 525 (6th Cir. 2006) ("Ohio state and federal courts rely on cases interpreting the ADEA and ADA for guidance because of the parallels between ORC 4112 and those federal statutes") (collecting cases); *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 848 n.1 (6th Cir. 2018) ("Because [Ohio Rev. Code § 4112's] prohibitions mirror those of the ADA …, the state-law claims rise or fall on the resolution of the federal claims. Thus, we do not address the state-law claims individually") (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1031 n.1 (6th Cir. 2014)).; *Moffat v. Wal-Mart Stores, Inc*., 624 F. App'x 341, 345 (6th Cir. 2015) ("Age-discrimination claims brought under Ohio law are analyzed under the same standards as claims brought under the ADEA") (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005)).

[15] Both parties set forth the standard applicable to circumstantial evidence in their briefing. (Docs. 13, 18). Additionally, this Court independently finds that Plaintiff has not proffered any direct evidence of discrimination.

a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Laster*, 746 F.3d at 730. Finally, if the defendant carries its burden, the burden shifts back to the plaintiff to prove that the defendant's stated reasons are a pretext. *Burdine*, 450 U.S. at 253; *Laster*, 746 F.3d at 730.

### *1. Disability Discrimination Claim*

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

To establish a prima facie case of ADA discrimination, Plaintiff must show that: (1) he had a disability; (2) he was otherwise qualified for his position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his position remained open, or he was replaced. *Moore*, 2025 WL 3025607, at *4 (citing *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023)). Alternatively, for a disparate treatment claim, Plaintiff may satisfy the fifth element by showing that similarly situated employees received favorable treatment. *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 n.2 (6th Cir. 2012).

#### a. <u>Plaintiff's *Prima Facie* Case – Disability Discrimination</u>

In its motion for summary judgment, Defendant argues that: (1) Plaintiff was not disabled within the meaning of the ADA; (2) Plaintiff was not qualified for the position

he held; and (3) there is no evidence that similarly situated employees received favorable treatment. (Doc. 13 at 25-26).

*i. Disability*

The ADA requires that the term "disability" "be construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(1). Under the ADA, the definition of "disability" includes, as relevant here: "a physical or mental impairment that substantially limits one or more major life activities of such individual" or "a record of such an impairment." *Id*. § 12102(1)(A), (B). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, … walking, standing, lifting, bending, … and working," as well as "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, [and] bladder[.]" *Id*. at § 12102(2). Notably, "[a]n impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." *Id*. at § 12102(4)(C). Additionally, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," such as medication, medical supplies, mobility devices, *etc*. *Id*. at § 12102(4)(E). And, finally, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id*. at § 12102(4)(D).

Defendant argues that "Plaintiff does not present any evidence that his cancer substantially impacted a major life activity." (Doc. 20 at 23). Specifically, Defendant notes that Plaintiff's only evidenced restrictions were temporary, *i.e.*, seven days of part-

time work and light duties following his October 29, 2021 release from the hospital. (*Id*.; Doc. 13 at 25). Moreover, Defendant argues that Plaintiff has not presented any evidence that he was subject to any continued medical restrictions after those seven days. (Doc. 20 at 23).

To start, the Court agrees that Plaintiff's evidence is limited in terms of how and to what extent Plaintiff's cancer impacted major life activities. However, there is sufficient documented evidence that Plaintiff was under continued restrictions at the time of his termination. On October 21, 2021, his physician permitted him to return to work subject to "[n]o lifting of 10-15 pounds for 6 weeks post op." (Doc. 13-2 at 339). Moreover, Plaintiff's surgery impacted "the operation of a major bodily function" such that he was required have a foley catheter in place, albeit for an unspecified period of time. (*Id*.) And, on October 29, 2021, Plaintiff was released from the hospital with the additional restriction of part-time work for seven days. (Doc. 13-2 at 9). More significantly, however, Plaintiff testified that, around January 2022, after additional doctor's visits and testing, he was required to undergo multiple rounds of radiation. (*Id*. at 14, 27-28). Plaintiff's radiation treatment occurred for 30 to 45 minutes a day, five days per week (Monday through Friday) for seven weeks, and left him very tired afterwards. (*Id*. at 28). And, notably, several weeks after treatment, Plaintiff learned that his cancer had not subsided but had in fact increased and spread, requiring an additional round of more aggressive radiation. (*Id*. at 29). As of the date of his deposition, Plaintiff still had cancer and was scheduled for continuing medical follow-ups. (*Id*. at 30).

In short, this Court cannot conclude that Plaintiff was not disabled, nor that he would be unable to evidence a disability within the meaning of the statute if this case were to proceed to trial.

*ii. Qualification for the Position*

The ADA defines a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position …." 42 U.S.C. § 12111(8). The statute further states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." (*Id.*)

"In determining whether a plaintiff has presented sufficient evidence of qualification to support a prima facie case, only the plaintiff's objective qualifications are relevant." *Highfill v. City of Memphis*, 425 F. App'x 470, 473 (6th Cir. 2011). "The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-576 (6th Cir. 2003).

To determine the minimum qualifications for a specific position, the Court should rely on the employer's own stated criteria (ideally in the form of a job posting or employment contract), and then assess Plaintiff's qualification with "focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576; *see also*, *Alexander v. CareSource*,

576 F.3d 551, 564 (6th Cir. 2009) ("[Employer's] job description amounts to evidence of the minimum job qualifications"); *Highfill v. City of Memphis*, 425 F. App'x 470, 474 (6th Cir. 2011) ("the most objective statement of the required qualifications … was [Plaintiff's] employment contract").

Defendant argues that Plaintiff is not a "qualified individual" because he was "unable to perform the essential functions of his position," based upon performance issues experienced while on the job. (Doc. 13 at 25-26). However, while issues of Plaintiff's actual, on-the-job performance are a relevant inquiry as to whether Defendant had a non-discriminatory reason for Plaintiff's termination, they do not speak to Plaintiff's "objective" qualification for the position as an initial matter.

Specifically, Defendant's "Position Description" sets forth the objective qualification of the Branch Manager position, as follows: "Post-secondary education in Business Management or related field preferred; 7+ years of construction/home remodeling experience; experience with service and installation programming preferred; Minimum of 5 years of progressive leadership experience; Driving record that meets company's insurance standards; Evidence of continuing education in leadership and business management." (Doc. 13-2 at 250).

In his deposition, Plaintiff cited a lengthy history of sales and installation management positions. (*Id*. at 50-54). But, beyond this, Plaintiff provides no evidence that he actually met the remaining required or preferred criteria—*i.e.*, whether he has post-secondary education in Business Management or a related field; whether his employment history constitutes a "[m]inimum of 5 years of progressive leadership

experience"; whether his driving record met insurance standards; or whether he evidenced engaging in "continuing education in leadership and business management." (*See* Doc. 13-2 at 250).

Additionally, Plaintiff's Opposition ignores these objective qualifications and focuses instead on his performance with Defendant, as well as the fact that Mr. Tripi believed Plaintiff had more "window knowledge" than Plaintiff's Columbus counterpart. (Doc. 18 at 19-20). But none of this speaks to the objective criteria for the Branch Manager position. Finally, Plaintiff's Declaration includes a copy of his resume from 2018 (*i.e.*, at least two years prior to applying for his position with Defendant). However, the document merely lists Plaintiff's employment history, but does not address whether Plaintiff actually met the specified criteria for Defendant's Branch Manager position. (Doc. 17-1).

In sum, Plaintiff has certainly demonstrated that he had relevant experience for the position, but he has not evidenced or even suggested that he in fact met the vast majority of the objective criteria to qualify for the position. Accordingly, Plaintiff fails to meet his burden as to this element.

*iii. Replacement and Disparate Treatment*

The final element of a *prima facie* disability discrimination case requires Plaintiff to show that either that he was replaced by someone outside of the protected case, or that similarly situated employees received favorable treatment. *See Moore*, 2025 WL 3025607, at *4; *Rosebrough*, 690 F.3d at 431 n.2.

To start, Plaintiff argues that Defendant replaced him with a nondisabled employee, Mike Sowers ("Mr. Sowers"), and that this fact alone satisfies the fifth element of Plaintiff's *prima facie* case. (Doc. 18 at 21). However, as Defendant notes, Plaintiff has not offered any evidence that Mr. Sowers was not disabled. (Doc. 20 at 24).

As to disparate treatment, "[a]t the summary-judgment stage, [Plaintiff] ha[s] to 'identify specific facts, as opposed to general allegations, establishing' that [Defendant] treated similarly situated nondisabled employees better." *Tumbleson v. Lakota Loc. Sch. Dist.*, 175 F.4th 773, 781 (6th Cir. 2026) (quoting *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020)). To show that he is "similarly situated," Plaintiff is "required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the comparison employee's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). Therefore, Plaintiff and the comparison employee "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones v. Potter*, 488 F.3d 397, 405 (6th Cir. 2007) (quoting *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 599 (6th Cir. 2001)).

In this regard, Defendant argues that "the record does not contain any evidence of similarly situated non-disabled individuals who were treated better than Plaintiff." (Doc. 13 at 26). Defendant further notes that the record, in fact, reflects similarly situated

employees within the protected class were not subjected to termination and were accommodated for their disabilities. (*Id*.)

In support of his claim, Plaintiff cites to his Columbus counterpart, Justin Clemons ("Mr. Clemons"). (Doc. 18 at 21-22). Specifically, Mr. Clemons was the Columbus Branch Manager at the same time that Plaintiff served as Branch Manager in Cincinnati and, similar to Cincinnati, the Columbus Branch was struggling to meet monthly and quarterly goals. (*See* Doc. 13-2 at 302-304). Indeed, in October 2021, when Mr. Tripi was assigned to serve as the Senior Branch Manager Mentor for the Cincinnati Branch, he was also tasked with providing the same review and mentorship to Columbus. (*See* Doc. 13-1 at 137). Plaintiff argues that, despite both branches underperforming, Defendant did not terminate Mr. Clemons. (Doc. 18 at 22).[16]

Here, the Court cannot conclude that Plaintiff and Mr. Clemons were similarly situated. Most notably, while the Columbus Branch was not meeting its revenue goals, those goals were significantly higher than what was expected of Cincinnati. Indeed, in Q1, Cincinnati's goal was $0, whereas Columbus was nearly $4,000,000. (Doc. 13-2 at 302). In Q2, Cincinnati's goal was $827,064, whereas Columbus was $5,453,306. (*Id*.) In Q3, Cincinnati's goal was $1,443,035, whereas Columbus was $3,977,109. (*Id*. at 303). And in Q4, Cincinnati's goal was $1,815,474, whereas Columbus was $3,808,166. (*Id*. at 304).

[16] As this Court discusses, *infra*, the evidence shows that Defendant perceived a stark contrast between Plaintiff and Mr. Clemons in terms of leadership. However, the Court will reserve this discussion for its pretext analysis.

Additionally, as Defendant's former CEO, Mr. Magden, testified, the Cincinnati Branch had a number of advantages over other branches. To start, as a newer market, Cincinnati did not have to contend with a backlog of jobs to schedule. (Doc. 13-3 at 40). Therefore, while other branches faced installer shortages, Cincinnati could have scheduled and completed installations expeditiously after a sale. (*Id.*) Moreover, Mr. Magden explained that, in Cincinnati, Defendant was purchasing its products from a local manufacturer known to have a quicker turnaround time, thereby further expediting the installation process. (*Id.*) Thus, the Cincinnati Branch was in an ideal position to meet its goals.

Conversely, Mr. Clemons took over as Branch Manager at an established branch. In other words, he inherited whatever troubles the branch was already experiencing. Thus, Mr. Clemons had to train on the job, earn the trust and respect of his staff, and meet Defendant's expectations, all while trying to resolve issues that he had no hand in creating. Indeed, Plaintiff's own evidence supports this finding. Specifically, Plaintiff offers the Declaration of Bernadette Wilson ("Ms. Wilson"), who served as Defendant's Customer Fulfillment Manager, and later Operations Manager, from 2019 to 2022; and then moved into a role on the collections team until her position was eliminated in February 2024. (Doc. 15). In her Declaration Ms. Wilson states: "**At the time of [Mr.] Clemons' hire**, Columbus had severe issues with management and staffing," and "the Columbus branch needed assistance with handling service calls, scheduling installation jobs, managing their installers and meeting their sales goals." (*Id.* at ¶¶ 15-16) (emphasis added).

In sum, the Court concludes that Plaintiff and Mr. Clemons were not similarly situated, as there are ample "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones*, 488 F.3d at 405. Accordingly, Plaintiff fails to meet his burden as to this element.

b. Defendant's Legitimate, Nondiscriminatory Explanation

Even assuming *arguendo*, that Plaintiff had met his initial burden, summary judgment would still be appropriate on the balance of the *McDonnell Douglas* analysis. Specifically, Defendant has asserted a legitimate, nondiscriminatory basis for Plaintiff's termination—*i.e.*, Plaintiff's performance issues.

As set forth in the facts, *supra*, following Plaintiff's training in February 2021, Mr. Tripi expressed concerns that Plaintiff would have difficulties with the managerial aspects of his new position. (Doc. 13-1 at 95-99; Doc. 13-6 at ¶ 8). And by June 2021, despite its low revenue goals and significant advantages, the Cincinnati Branch had already begun to underperform. (Doc. 13-2 at 302). Further, over the next few months, Defendant heard repeatedly that Plaintiff's absence, poor communication, and lack of leadership were contributing to employee resignations, frustration and possible loss of experienced installers, and delays and issues with installations.

"Poor performance is a legitimate non-discriminatory reason for terminating an employee." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 802 (6th Cir. 2007) (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001)). Thus, the Court finds that Defendant has met its burden by articulating a legitimate, non-discriminatory basis for Plaintiff's termination.

c. Pretext

As Defendant has stated a legitimate, non-discriminatory basis for Plaintiff's termination, the burden shifts back to Plaintiff to prove that Defendant's stated reasons are a pretext. *Burdine*, 450 U.S. at 253.

"The plaintiff may demonstrate that the defendant's explanation was merely pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the termination, or (3) that the proffered reason was not sufficient to motivate the discharge." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (citing *Manzer v. Diamond Shamrock Chem. Co*., 29 F.3d 1078, 1084 (6th Cir. 1994)).

Here, Plaintiff argues that Defendant's proffered reason had no basis in fact and that the proffered reason did not actually motivate the termination. (Doc. 18 at 27-34).

*i. No Basis in Fact*

To start, Plaintiff alleges that Mr. Tripi's articulated basis for Plaintiff's termination is inconsistent with Defendant's articulated basis for termination. (*Id*. at 27). Specifically, Plaintiff states that "Defendant's articulated basis for terminating [Plaintiff] is that he did not meet expectations. However, on October 23, 2021, [Mr.] Tripi, … claimed '[Plaintiff] is just too weak and disorganized' as the basis for his termination." (*Id*.) But these two statements are not inconsistent. Logically, being "weak and disorganized" contributes to not meeting expectations. And, indeed, this had been the concern that Mr. Tripi expressed as early as Plaintiff's February 2021 training. Thus, the Court rejects this argument.

Plaintiff further argues that Mr. Tripi's testimony regarding rumors of employee, installer, and customer complaints is directly disputed. (*Id*. at 27, 31). However, there is ample evidence, as cited in the Facts, *supra*, that these concerns were being discussed throughout Plaintiff's tenure. For instance, Plaintiff cites to the rumor that Mr. McDonald quit abruptly due to Plaintiff's poor leadership, noting that Mr. McDonald has provided a Declaration disputing this claim. (*Id*.) However, the rumor regarding Mr. McDonald was heard by multiple sources and, according to Ms. Smyth-Riding, was reaffirmed by Mr. McDonald when he interviewed to return to work for Defendant after Plaintiff's termination. Moreover, Mr. McDonald's replacement expressed precisely the same frustrations. Thus, whether the rumor was true or not, there is ample evidence to support Defendant's reliance on those complaints.

Next, Plaintiff states that "Defendant's insistence that [Mr.] Tripi had no knowledge of [Plaintiff's] cancer is simply not believable. Not only did [Plaintiff] unequivocally testify that he informed [Mr.] Tripi that he had prostate cancer, but [Mr.] Hoitt and [Mr.] Magden admitted they knew about [Plaintiff's] cancer." (*Id*. at 28). First and foremost, Plaintiff did not "unequivocally testify" that he informed Mr. Tripi of his cancer diagnosis. Indeed, Plaintiff's citation to the deposition points to Plaintiff testifying regarding "Ray" and "Joey," (*i.e.*, Mr. Price and Mr. Jones), not Mr. Tripi. (Doc. 13-2 at 132). And, even in that regard, Plaintiff's testimony is far from unequivocal. Indeed, Plaintiff merely alludes to talking with Mr. Price and then asserts that "So he was aware, and Joey was aware." (*Id*.) Notably, however, one page prior, Plaintiff was asked directly whether "Ray [Price] and Joey [Jones]" were aware of his

cancer diagnosis, to which Plaintiff responds, "Yes. **I believe so**." (*Id*. at 131) (emphasis added). Further, as to the remainder of Plaintiff's claim, the fact that Mr. Hoitt and Mr. Magden knew of Plaintiff's cancer in no way speaks to Mr. Tripi. Notably, Mr. Hoitt and Mr. Magden were Plaintiff's superiors, whereas Mr. Tripi was just the Cleveland Branch Manager. While Plaintiff would have had ample reason to tell his supervisors about his specific diagnosis, he would have no reason to tell another Branch Manager located clear across the state.

Plaintiff also alleges that "[Mr.] Tripi denied knowledge of [Plaintiff's] hospitalization immediately prior to his termination," whereas an email from Ms. Mullins to Mr. Tripi dated October 27, 2021 apprised Mr. Tripi of Plaintiff's hospitalization. (Doc. 18 at 28). Again, Plaintiff mischaracterizes the testimony. Mr. Tripi merely testified that, in October 2024, *i.e.*, three years after the event, he had "no recollection" of Plaintiff being in the hospital prior to his termination. (Doc. 13-1 at 104).

Plaintiff further takes issue with Mr. Tripi and Ms. Smyth-Riding characterizing Plaintiff's surgery as a "procedure," claiming that the witnesses are "attempt[ing] to diminish" the severity of the surgery. (Doc. 18 at 28-29). However, the emails that Plaintiff sent at the time of his surgery never specify the type of surgery, nor did Plaintiff's email ever state that he has cancer. Indeed, the message Plaintiff conveyed in his own emails is that he will be having surgery but will return to work within a matter of days, even after having complications.

Thus, contrary to Plaintiff's assertion, none of the cited testimony suggests that Mr. Tripi or Ms. Smyth-Riding, as the primary decision makers behind Plaintiff's

termination, had any specific knowledge of Plaintiff's cancer diagnosis at the time of their decision, nor that they took issue with any requested accommodation.

Plaintiff goes on to cite to apparent inconsistencies in the testimony of Mr. Hoitt and Mr. Magden regarding their prior knowledge of Plaintiff's termination. (Doc. 18 at 30). For instance, Plaintiff claims that Mr. Hoitt "denied involvement" in the termination, but Plaintiff cites to an email dated October 28, 2021 in which Mr. Hoitt states that there is "a plan in the works" for Plaintiff—insinuating that Mr. Hoitt was somehow more involved or knowledgeable than he claims. (*Id.*) But Mr. Hoitt never denied knowledge of the termination. Indeed, he testified that "I know he was terminated, **and I'm sure it was run by me somehow** … but I don't remember how or when." (Doc. 13-5 at 37) (emphasis added). Additionally, Mr. Magden denied involvement or knowledge, but Plaintiff cites to an email dated October 23, 2021, in which Mr. Magden assures Mr. Price that "aggressive action will be taken" with regard to Plaintiff's performance issues. (Doc. 13-2 at 326). While this can arguably be construed as an inconsistency in Mr. Magden's testimony, it does not establish that Defendant's articulated reason for termination is a pretext.

Plaintiff goes on to argue that Defendant's cited performance issues were the result of inconsistent instructions from his superiors, and that he was actually performing well in his position. (Doc. 18 at 31-33). However, "[a]n employee's opinion that he did not perform poorly is irrelevant to establishing pretext where **the employer reasonably relied on specific facts before it indicating that the employee's performance was poor**." *Stockman*, 480 F.3d at 802 (citing *Majewski*, 274 F.3d at 1117) (emphasis added).

*ii. Motivation*

Finally, Plaintiff argues that "Defendant could not have actually relied on [Plaintiff's] alleged performance concerns when the Columbus branch, run by a significantly younger and non-disabled employee, had performance concerns, but its Branch Manager was not terminated and remains employed to date." (Doc. 18 at 33).

This Court has already discussed, in part, what distinguished Plaintiff's circumstances from those of Mr. Clemons. And on that basis alone, the Court rejects this argument.

Additionally, however, the Court notes that, despite both Cincinnati and Columbus struggling, Defendant has evidenced that, to their knowledge, there were clearly different reasons for the underperformance.

First, the Court acknowledges Mr. Wilson's Declaration, in which Ms. Wilson states that her role as Operations Manager required her to "travel[] into different markets to help train and assist [Defendant's] branch employees." (*Id*. at ¶ 4). In that capacity, Ms. Wilson traveled to both Cincinnati and Columbus, where she witnessed various issues. (*Id*. at ¶ 5-6, 14-16). In short, Ms. Wilson praised Plaintiff's efforts during his tenure as Branch Manager and noted that Cincinnati was understaffed. (*Id*. at ¶¶ 6-13, 21). As to the Columbus Branch, Ms. Wilson states: "At the time of [Mr.] Clemons' hire, Columbus had severe issues with management and staffing," and that "the Columbus

branch needed assistance with handling service calls, scheduling installation jobs, managing their installers and meeting their sales goals." (*Id*. at ¶¶ 15-16).[17]

On the other hand, Mr. Tripi's assessments, in his October 2021 role as mentor, were quite different. To start, as manager of the successful Cleveland Branch, Mr. Tripi was uniquely positioned to understand the roles and responsibilities of the Branch Manager position, as well as how best to resolve difficulties and issues that arise day-to-day. Moreover, prior to visiting Cincinnati and Columbus as a mentor, Mr. Tripi reviewed numerous reports on the branches' performance and efficiency, including revenue, accounts receivables, unscheduled installations, and whether completed jobs were properly tracked in the system. (Doc. 13-1 at 56-58). Mr. Tripi also reviewed customer complaints, spoke to the Branch Managers and staff, and called installers. (*Id*. at 45, 55-63, 84-85). And while Mr. Tripi acknowledged in his deposition that Columbus did have issues with accounts receivables and installers, he explained that this was a stark contrast to the issues with Cincinnati. (*Id*. at 84-85). Mr. Tripi testified that:

> [T]he Columbus branch had a branch manager [Mr. Clemons] that was present and available and communicated. <u>**The issues in Cincinnati were leadership-related**</u>. They felt as if, both internally from sales and from the installation base, the feel was that there was not the level of communication necessary to support the branch and to support the achievement of the goals. And this would have been reflected in even the monthly reporting that we would get showing that certain goals were not being achieved.

(*Id*. at 85) (emphasis added).

[17] The Court notes that Plaintiff offers no context for Ms. Wilson's observations regarding the issues with the two branches. Specifically, it is unclear what information Ms. Wilson had available to her in reaching her conclusions, how long she spent observing the branches, and whom she communicated with while she was present.

Additionally, Ms. Smyth-Riding echoed the concern with regard to leadership during her deposition. Specifically, when asked whether any Columbus Branch employees had concerns regarding Mr. Clemons, Ms. Smyth-Riding testified: "No, nobody had concerns about [Mr. Clemons]. They thought he was very supportive. He was there and present." (Doc. 13-4 at 84).

In short, both Columbus and Cincinnati had problems to resolve—but in Cincinnati, Defendant's perception was that Plaintiff was the problem. Thus, the fact that Mr. Clemons was not terminated does not undermine Defendant's non-discriminatory explanation, nor does it support finding Defendant's explanation is pretext.

Accordingly, the Court finds that Plaintiff has failed to establish a *prima facie* case of disability discrimination. Additionally, even if Plaintiff had met his burden, Defendant articulates a legitimate, non-discriminatory explanation for his termination, and Plaintiff has failed to evidence that this explanation is a pretext. Therefore, based upon the law and the undisputed material facts, the Court finds that judgment in favor of Defendant is warranted as to the disability discrimination claim.

***2. Age Discrimination Claim***

Plaintiff bears the burden of persuasion to show that "age was the 'but-for' cause of the employer's adverse action." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). To establish a *prima facie* case of age discrimination, Plaintiff must show: (1) he is a member of a protected class (*i.e.*, that he was at least 40 years old at the time of the alleged discrimination); (2) he was subjected to adverse employment action; (3) he was

otherwise qualified for the position he held; and (4) he was replaced by someone notably younger or someone outside of the protected class, or that there are circumstances to support an inference of discrimination. *Moffat v. Wal-Mart Stores, Inc*., 624 F. App'x 341, 346 (6th Cir. 2015) (citing *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 521 (6th Cir. 2008)).

Defendant does not dispute that Plaintiff was over the age of 40 and that he was subjected to adverse employment action, but argues that Plaintiff was not qualified for his position and that he was not replaced by someone outside of the protected class.

As to Plaintiff's qualification, the Court reiterates its prior finding, *supra*. Accordingly, Plaintiff has failed to meet this element of the analysis.

As to the final element, Plaintiff was replaced by Mr. Sowers who was 43 years-old. Though not outside of the protected class, Mr. Sowers was, nevertheless, 18 years younger than Plaintiff. *See Grosjean v. First Energy Corp*., 349 F.3d 332, 336 (6th Cir. 2003) (even within the protected class, an "[a]ge differences of ten or more years have generally been held to be sufficiently substantial to meet the requirement of the fourth part of age discrimination prima facie case"). Thus, Plaintiff has met his burden as to this element.

Regardless, because Plaintiff failed to show that he was qualified for the position, the Court finds that Plaintiff has not established a *prima facie* case of age discrimination. However, even if Plaintiff had made the necessary showing, the burden would shift to Defendant and, as this Court previously found, Defendant has articulated a legitimate, non-discriminatory basis for Plaintiff's termination. Therefore, Plaintiff would bear the

burden to establish pretext. And for the same reasons set forth, *supra*, the Court finds that Plaintiff fails at this stage.

The Court notes, however, one distinguishing fact with regard to pretext for the age discrimination claim. That is, Plaintiff asserts that Mr. Hoitt commented on Plaintiff's age during the February 2021 training. (Doc. 18 at 24). Specifically, Plaintiff stated at his deposition that Mr. Hoitt called him in his hotel room on the first evening of training for a casual conversation in which they discussed Plaintiff's first day, dinner, evening plans, *etc*. (Doc. 13-2 at 89-90). Plaintiff testified that, during this call, he said something along the lines of: "I'm a little older. I need to go to bed and be fresh for tomorrow." (*Id*. at 90). In response, Plaintiff states that Mr. Hoitt asked him his age and, upon hearing the answer, Plaintiff claims that Mr. Hoitt responded with: "Damn, you're old; why the hell did we hire you?". (*Id*.) Plaintiff testified that Mr. Hoitt immediately stated he was only joking, but Plaintiff did not take the comment as a joke. (*Id*. at 90). Nevertheless, Plaintiff chose not to report the comment to HR. (*Id*. at 90-91). Plaintiff further testified that this was the only age-related comment he could recall being made during his employment. (*Id*. at 90). Mr. Hoitt testified that he has no recollection of this conversation. (Doc. 13-5 at 16).

The Court finds this alleged incident is insufficient to establish that Plaintiff's age was the motivating factor in his termination. First, it was a singular comment, made in the context of an otherwise amicable conversation. Moreover, Mr. Hoitt was not Plaintiff's direct supervisor at the time of termination, nor did he play a role in the termination. And Plaintiff cites to no other age-related comments made to or about him,

whether by Mr. Hoitt or anyone else. *See Smith v. City of Union, Ohio*, 144 F.4th 867, 875 (6th Cir. 2025) (assessing whether employer's age-related comments can raise an inference of ageist animus, the Court considers circumstances such as whether the speaker was a decisionmaker, whether the comment was made during a decision-making process, and whether the comment was clear and repeated, or ambiguous and isolated).

Accordingly, Plaintiff has failed to meet his burden to establish a *prima facie* case of age discrimination. Moreover, Defendant has articulated a legitimate, non-discriminatory explanation for his termination, and Plaintiff has failed to evidence that this explanation is a pretext. Therefore, based upon the law and the undisputed material facts, the Court finds that judgment in favor of Defendant is warranted as to the age discrimination claim.

**B. Failure to Accommodate**

"ADA discrimination 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination[.]" *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). Thus, as an initial matter, Plaintiff must establish a *prima facie* case by showing that: (1) he was disabled as defined by the ADA; (2) he was otherwise qualified for his position, with or without reasonable accommodation; (3) the employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 669 (6th Cir. 2020). "If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation

would cause undue hardship for the employer." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022).

Here, and as previously addressed, Plaintiff fails to show that he was qualified for his position and, accordingly, fails to establish a *prima facie* case.

Additionally, Plaintiff fails to evidence that Defendant failed to provide a requested accommodation. Indeed, Plaintiff's only assertion in this regard is that: "Only after Plaintiff's surgery, complications, and notifications that he had work restrictions did Defendant begin discussing his termination." (Doc. 18 at 26). This statement is broadly misleading and speculative at best. As previously discussed, the concerns regarding Plaintiff's performance pre-date his surgery and even his diagnosis. Moreover, the decision to send Mr. Tripi to Cincinnati was memorialized in an email on October 7, 2021 (and presumably decided at some point prior to that date). (Doc. 13-1 at 134-137). Moreover, contrary to Plaintiff's contention that "the first and only email that critiqued Plaintiff's performance occurred on October 22," the email he is referencing was actually an email forward, with the original message having been sent by Mr. Jones on September 23, 2021. (Doc. 13-2 at 327).

Significantly though, all of these dates are virtually meaningless, because Plaintiff fails to evidence or even suggest a date on which he requested an accommodation. To be sure, Plaintiff notified someone that he would be out for surgery, as evidenced by the fact that his October 17, 2021 email begins with: "The surgery was a lot longer and more complicated than expected …." (Doc. 13-4 at 155). And despite having no lead-in to this statement, none of the recipients expressed surprise at the mention of surgery.

Ultimately, however, Plaintiff offers no evidence that Defendant took issue with Plaintiff's absence for surgery or recovery (the issue consistently raised was Plaintiff's absence from the office on all other occasions). In fact, Plaintiff conceded during his deposition that Defendant likely would have accommodated additional time off for his recovery had he requested it. (Doc. 13-2 at 133). And, following his surgery, Defendant specifically reached out to Plaintiff and asked for documentation regarding his necessary accommodations and then cleared him to return to work. (*Id*. at 337; Doc. 13-5 at 56).

In short, Plaintiff fails to show that he was denied an accommodation. Additionally, Plaintiff fails to show that he was qualified for the position. Accordingly, Plaintiff has failed to establish a *prima facie* case of failure to accommodate. Therefore, based upon the law and the undisputed material facts, the Court finds judgment in favor of Defendant is warranted as to the failure to accommodate claim.

## IV. CONCLUSION

Based upon the foregoing, Defendant's motion for summary judgment (Doc. 13) is **GRANTED**, and this case is dismissed with prejudice. The Clerk's Office shall docket a Judgment accordingly.

**IT IS SO ORDERED**.

Date: 9/30/2026

Timothy S. Black
United States District Judge